UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN R. ESTOCK, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) C.A. No. 09-cv-30218-MAP |
| | ) |
| CITY OF WESTFIELD, HILARY | ) |
| WEISGERBER, THOMAS MCDOWELL, | ) |
| MICHAEL R. BOULANGER, MARY ANN | ) |
| CLELAND, LAURA MALONEY, KEVIN | ) |
| SULLIVAN, ROBERT J. KAPINOS, | ) |
| MARY BETH OGULEWICZ-SACCO, | ) |
| HEATHER SULLIVAN, JOHN YORK, | ) |
| JAMES J. WAGNER, and | ) |
| STEVEN PIPPIN, | ) |
| Defendants | ) |

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 20)

July 26, 2011

PONSOR, D.J.

## I.  INTRODUCTION

Plaintiff's eighteen-count complaint against thirteen individuals and entities associated with his former employer, Westfield Vocational Technical High School ("WVTHS"), offers two federal claims and numerous alleged violations of state law.[1] Defendants have moved for summary judgment on all counts (Dkt. No. 20).

---

[1] Plaintiff agreed at a scheduling conference to dismiss with prejudice Counts 10 and 11 alleging violations of his federal and state rights to a safe and healthy workplace. (Dkt. No. 10.)

Notably, Plaintiff has attributed no specific wrongdoing in either the complaint (Dkt. No. 1, Compl.) or his Local Rule 56.1 Statement of Material Facts (Dkt. No. 25) to nine of the thirteen named Defendants. Accordingly, with no further discussion necessary, the court will allow summary judgment on all claims as to Michael R. Boulanger, Mary Ann Cleland, Laura Maloney, Kevin Sullivan, Robert J. Kapinos, Mary Beth Ogulewicz-Sacco, Heather Sullivan, John York, and the City of Westfield.

The remaining Defendants are Hilary Weisgerber, as Director of WVTHS and in her personal capacity; Thomas McDowell, as former Superintendent of Westfield Public Schools and in his personal capacity; James J. Wagner, Assistant Director of WVTHS; and Steven Pippin, Personnel Director of WVTHS. While these Defendants figure more prominently in the facts of this case, the court will allow summary judgment as to all claims against all of them.

## II. <u>FACTS</u>

In 1994, Plaintiff began teaching at Westfield Vocational Technical High School in the Heating, Ventilation, and Air Cooling ("HVAC") Program. As a public school teacher, he was a member of the Westfield Education Association/Massachusetts Teachers Association Union, which was covered by a collective bargaining agreement. (Dkt. No.

21, Ex. 50.) From the date of his hire through June 30, 2006, Plaintiff reported to then-Director of WVTHS Defendant Steven Pippin. On July 1, 2006, Defendant Hilary Weisgerber assumed the position of Director and became Plaintiff's direct report.

Immediately upon arrival in July 2006, Defendant Weisgerber commenced preparations for the WVTHS's annual General Advisory Committee meeting held at the school every January. In doing so, Defendant Weisgerber began a review of the school's twelve vocational shop programs to "put together a five year Capital Improvement Plan, reviewing all programs for their viability." (Dkt. No. 27, Ex. 8, Weisgerber Dep. 35:8-10.) On July 25, several weeks after she took over as director, Defendant Weisgerber sent a memorandum to Defendant Thomas McDowell, the Superintendent, recommending a two-year phase-out of the HVAC department, which, at that time, consisted of two full-time teaching positions, one of which was held by Plaintiff. (Dkt. No. 27, Ex.7.) Her primary reasons for the recommendation included Plaintiff's inability to create a workable budget, a lack of a written curriculum, a failure to place students in the HVAC industry,[2] and student complaints that "they do

---

[2] Minutes from a January 2006 HVAC Advisory Board meeting indicate that many students in the HVAC department were unable to participate in the school's apprenticeship program, through

3

nothing all day in HVAC." (Id.) Defendant Weisgerber noted that she had attempted to speak with Plaintiff about his need to prepare a budget and that, in front of several staff members, "he became very upset and belligerent." (Id.)

Six months later, on January 29, 2007, the General Advisory Meeting was held at the school. According to a memorandum that Plaintiff sent to Defendant McDowell on February 2, the members of the Advisory group visited his shop for the last five minutes of the meeting. Plaintiff, who had still failed to submit a budget or a five-year plan as requested by Defendant Weisgerber, "felt attacked" because he was asked why he had not prepared these materials. (Dkt. No. 27, Ex. 10.) Plaintiff explained that he had not understood that he was supposed to have these materials prepared for this meeting and also stated that he was "insulted" that the group did not stay longer to learn about his program. (Id.) He later apologized for his behavior during this interchange, stating that he regretted "creating this horrible situation" and stating that it was "never my intention to be rude to anyone." (Id.) Defendant Weisgerber detailed the meeting in a memorandum to Defendant McDowell, describing Plaintiff and his fellow HVAC teacher

which local businesses offered students opportunities to gain experience while still in school, due to the students' failing grades in other courses. (Dkt. No. 27, Ex. 9.)

4

as "rude and belligerent" and expressing her concern that Plaintiff's presentation would impact the School Committee's funding decisions. (Dkt. No. 21, Ex. 3.)

On February 6, Defendant McDowell held a meeting in his office at which he questioned Plaintiff about his conduct at the General Advisory Committee meeting. In his notes from the meeting, Defendant McDowell wrote that Plaintiff admitted to behaving inappropriately and lying to the School Committee and stated that he would like the opportunity to apologize to the School Committee for his conduct. (Dkt. No. 21, Ex. 5.) Defendant McDowell also noted that Plaintiff expressed that he was "frustrated, tired [and] sick" and had "personal problems," and that he "broke down crying." (Id.) After the meeting, Defendant McDowell sent Plaintiff home instead of back to his classroom due to his "emotional state" and required that he return with a doctor's note verifying his ability to work. (Dkt. No. 21, Ex. 6.)

In a letter to the Department of Education, Plaintiff later described this meeting as follows: "During a meeting with our superintendent he . . . verbally assaulted me to a point that I had to be carried out of the room to seek emergency medical treatment. I was subsequently out of the shop and class for six weeks." (Dkt. No. 27, Ex. 4.)

On February 12, 2007, Defendant McDowell suspended Plaintiff without pay for one week following his "unprofessional and disrespectful" conduct at the General Advisory Meeting and his continuing failure to prepare his budget in contravention of Defendant Weisgerber's request. (Dkt. No. 21, Ex. 6.)  In his letter to Plaintiff, he observed that Plaintiff was the only teacher of the twelve vocational lead teachers to fail to turn in a budget and a plan.  (Id.)

On March 27, 2007, roughly seven weeks after his meeting with Defendant McDowell, Plaintiff provided a note from his physician, Dr. Gurpal Kingra, stating, "Mr. Estock can return to work.  He is advised to avoid stress."  (Dkt. No. 21, Ex. 9.)

On April 25, 2007, Defendant Weisgerber followed up her 2006 memorandum to Defendant McDowell with a recommended "HVAC Two Year Phase Out Plan."  (Dkt. No. 21, Ex. 10.) Defendant Weisgerber wrote, "This proposal is being made due to our belief that it is fiscally impossible to restructure, replenish, and renovate the program to the degree needed to make it a current, viable trade program which reflects the needs of the industry.  Further, placement data historically does not warrant its continuation."  (Id.)  She mapped out two potential phase-out scenarios, both of which required

only one full-time teacher over a two-year period.

Defendant Weisgerber concluded by stating:

> I feel this is the only alternative we have at
> this time.  The instructors [sic] unwillingness to
> cooperate with Administration, develop appropriate
> lesson plans and ways to meet the demands of the
> COP (Certificate of Occupational Proficiency) make
> this a necessary recommendation.

(Id.)

In the spring of 2007, according to Defendant
Weisgerber, the School Committee approved closure of the
HVAC program.  (Dkt. No. 27, Ex. 8, Weisgerber Dep. 103:3-
4.)  In June 2007, the approximately eight WVTHS freshmen
who were enrolled in the HVAC program and their parents were
notified that the HVAC program would be phased out.  The
phase-out did not impact the program's sophomores or
juniors.  (Dkt. No. 27, Ex. 8, Weisgerber Dep. 95:8-10.)
Plaintiff's HVAC colleague was laid off at the end of the
school year, and Plaintiff remained as the sole HVAC
teacher.

On September 6, 2007, at the beginning of the new
school year, Plaintiff sent a memo to Defendant Weisgerber
notifying her that, although she had contacted all other
department heads, she had failed to communicate with him
over the summer regarding his program's budget, which, he
wrote, "leads me to believe that I will not have any money
to operate this program for the remaining two years."  (Dkt.

No. 21, Ex. 14.)  Defendant Weisgerber responded by memo
that she had, once again, never received a proposed budget
from him and so no budget prioritization meeting was
necessary, but she had budgeted $3000 for him for supplies
for the year.  (Dkt. No. 21, Ex. 15.)

On September 7, 2007, Plaintiff alerted the Westfield
Public Schools that he planned to retire when the HVAC
program closed in June 2009 "in light of the circumstances
of the past year . . . and the atmosphere that my program
has endured for the past six or so years."  (Dkt. No. 21,
Ex. 16.)

On September 19, 2007, WVTHS held its annual fall open
house for parents.  The following day, Defendant Weisgerber
sent a memo to Defendant McDowell's replacement,
Superintendent Shirley Alvira (who is not a defendant),
stating that "a situation" had occurred at the open house,
which she described as Plaintiff "baiting the parents into a
frenzy."  (Dkt. No. 27, Ex. 17.)  Defendant Weisgerber
explained that she entered the HVAC shop at 7:00 P.M.,
observed pizza and soda in the room, and was confronted by a
group of angry parents questioning her about the future of
the HVAC program.  According to Defendant Weisgerber, the
parents told her that Plaintiff had informed them that he
was uncertified in certain key areas of HVAC teaching, and

thus their students would not receive a comprehensive education now that the other teacher had been laid off. Defendant Weisgerber wrote:

> Other than Mrs. Hague [mother of a student], this is the first time since this decision was made back in the spring that I am hearing from this group of parents. It is my belief that Mr. Estock has fueled this situation and is creating a very unhealthy and unsafe situation for the students.

(Id.) According to one parent, at the open house, Plaintiff "was without sufficient information" to answer questions from parents about the program's closure, and Defendant Weisgerber was "very hostile and dismissive." (Dkt. No. 27, Ex. 14, D'Astous Aff. ¶ 8.) Another parent described Defendant Weisgerber as "hostile and defensive." (Dkt. No. 27, Ex. 13, Hague Aff. ¶ 9.)

On September 27, 2007, Defendant Weisgerber placed Plaintiff on an indefinite paid administrative leave. The leave letter stated as follows:

> The basis for the leave is the pending investigation relative to the allegation of your improper conduct in your position as a teacher in the Westfield Public Schools related to the Open House held on Wednesday, September 19, 2007.
> You are to have no contact with students and parents of the HVAC program or any other school staff related to this investigation during the leave of absence.

(Dkt. No. 27, Ex. 18.)

The day after Plaintiff's suspension, Defendant Weisgerber sent a memorandum to Jeffrey Wheeler, the

Department of Education ("DOE") Director of Career/ Vocational Technical Education, proposing elimination of the HVAC program and outlining two potential two-year phase-out plans. (Dkt. No. 21, Ex. 21.)  Defendant Weisgerber stated that she was making this proposal "due to our belief that it is fiscally impossible to restructure, replenish, and renovate the program to the degree needed to make it a current, viable trade program which reflects the needs of the industry."  (Id.)  The letter concluded with a brief paragraph about Plaintiff, including that he had been unwilling to work with the administration and failed to develop appropriate lesson plans.  (Id.)

Following Plaintiff's suspension, Defendant Weisgerber conducted an investigation regarding the open house.  Parent Pandora Hague, who had expressed dismay at both the closure and at Defendant Weisgerber's conduct, testified that on September 28, her son had called her from school to say that a police officer was questioning the HVAC class about who paid for the pizza that was served at the open house.  (Dkt. No. 27, Ex. 13, Hague Aff. ¶ 12.)  Several days later, on October 2, Defendant Weisgerber summoned Ms. Hague and her husband to the school and "immediately began questioning us about who purchased the pizza."  (Id. ¶ 13.)  The Hagues redirected the conversation to the closure of the HVAC

program, including the question why Plaintiff was replaced by an "unlicensed, uncertified and untrained substitute teacher." (Id. ¶ 10.)

On October 15, 2007, Plaintiff attended a meeting regarding the investigation of the open house at which Defendant Weisgerber posed the following question: "The students reported that they have done a great deal of work cleaning the shop and taking material such as copper to the junk yard to buy tools [,] is this true?" (Dkt. No. 21, Ex. 39.) Plaintiff responded that it was true and that he had used the money to buy pizza and soda for the open house. (Id.)

Meanwhile, at its October 2, 2007, meeting, the Westfield School Committee placed the closure of the HVAC program on its agenda.[3] The room was filled to capacity, and several police officers stood at the entrance, allowing newcomers in only after someone else exited. Numerous people awaiting entry were visible through a window. Several parents spoke in support of the program and particularly of Plaintiff's abilities, noting Plaintiff's positive impact on their children, many of whom had difficulty academically. Current students and HVAC-program

---

[3] A video of this meeting was provided to the court. (Dkt. No. 27, Ex. 20.)

graduates also spoke in favor of "Mr. E," and the HVAC program. Also in the room were approximately ten people who identified themselves as supporters of Defendant Weisgerber's recommendation to eliminate the HVAC program. At the conclusion of the public comment portion of the meeting, without responding to any of the public comments, Superintendent Alvira announced that the program would be closed and that the closure had been approved by the DOE.

The following day, on October 3, 2007, DOE Director Wheeler sent a letter to Defendant Weisgerber approving one of the two phase-out plans that she had submitted. (Dkt. No. 21, Ex. 22.)

Plaintiff, who remained on leave, subsequently initiated arbitration proceedings against the school and filed a discrimination complaint with the Massachusetts Commission Against Discrimination ("MCAD"). He also filed a claim alleging various wrongdoings with the Massachusetts Department of Elementary and Secondary Education. In January 2008, Stephen Hagen, the Director of Human Resources for Westfield Public Schools, offered a settlement to Plaintiff pursuant to which he would agree to "return to work with the expectation that he will maintain professional conduct expected of all teachers" and present his lesson plans in writing to Defendant Weisgerber in exchange for

dropping the suit.  (Dkt. No. 21, Ex. 40.)   After several
weeks, Mr. Hagen contacted Plaintiff to inform him that some
response to the offer was necessary because "the District
needs to reassess its position and move forward with other
options.  This is not a threat, but a statement of concern
about the education of the students in this program."  (Dkt.
No. 21, Ex. 42.)   In April, Plaintiff's attorney made a
counteroffer whereby Plaintiff would be paid for the week
that he was suspended following the General Advisory Meeting
and all accusations of inappropriate conduct would be
removed from his file.  (Dkt. No. 21, Ex. 45 at 10.)   On
April 16, 2008, Helen Bowler, attorney for the City of
Westfield, agreed to nearly all of Plaintiff's settlement
requests.  Two months later, Plaintiff declined to accept
the proposed settlement.  (Dkt. No. 21, Ex. 45 at 14.)

     Meanwhile, on April 11, 2008, Plaintiff sent a letter
to the Environmental Protection Agency advising that an
unlicensed substitute teacher was running the HVAC program,
that students were working without protective gear, and that
Freon was possibly being released into the air.  (Dkt. No.
27, Ex. 5.)

     On June 11, 2008, Superintendent Alvira notified
Plaintiff that his position had been eliminated "due to
declining enrollment" and that, based on his seniority and

licensure, he would be presented with a list of open positions for the following school year. (Dkt. No. 27, Ex. 30.) Plaintiff immediately responded to Superintendent Alvira that he would be "exercising my right under the Collective Bargaining Agreement to bump any person in the electrical program with less seniority." (Dkt. No. 27, Ex. 31.) On July 10, 2008, Mr. Hagen responded to the effect that the school records indicated that Plaintiff did not hold the requisite licenses to teach in the electrical program and that Plaintiff should contact him if this was incorrect. (Dkt. No. 21, Ex. 46, Hagen Aff. ¶ 8; Dkt. No. 21, Ex. 46, Attach. A.) According to Mr. Hagen, Plaintiff never responded. (Id.) However, in August, Plaintiff sent a letter to Superintendent Alvira stating that he had yet to receive a list of open positions. (Dkt. No. 27, Ex. 32.)

On June 23, 2008, MCAD issued findings based on its investigation of Plaintiff's claims of disability and age discrimination and concluded that the claims lacked probable cause. (Dkt. No. 21, Ex. 31.) On October 16, 2008, the Massachusetts Department of Elementary and Secondary Education issued its findings based on Plaintiff's allegations and found that all of them lacked support. (Dkt. No. 21, Ex. 36.)

### III. DISCUSSION

A.  <u>Legal Standard</u>.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The burden then shifts to the opposing party who must demonstrate that a reasonable jury could return a verdict in its favor based on the evidence.  <u>Id.</u>  "A party opposing summary judgment must present definite, competent evidence to rebut the motion."  <u>Torres v. E.I. Dupont De Nemours & Co.</u>, 219 F.3d 13, 18 (1st Cir. 2000) (citations omitted).

B.  <u>Employment Related Claims: Count 1: Breach of Contract; Count 2: Breach of Covenant of Good Faith and Fair Dealing; Count 3: Breach of Promises Made by a Public Employer; Count 7: Wrongful Termination in Violation of Public Policy</u>.

Defendants seek summary judgment on Plaintiff's claims that are related to his termination, Counts 1, 2, 3, and 7, on the grounds that Plaintiff failed to exhaust his administrative remedies because he did not follow the procedures set forth in the Collective Bargaining Agreement ("CBA").  (Dkt. No. 21, Ex. 50.)  Plaintiff responds that he "is challenging not the personnel decision to terminate his position (<u>an area clearly within the scope of the CBA</u>), but

15

rather the malicious elimination of the HVAC program which has the indirect but very real impact of the elimination of his teaching position." (Dkt. No. 24, Pl. Mem. in Opp'n, at 11 (emphasis added).)

This argument is unavailing, as all of these counts directly target Defendants' decision to terminate Plaintiff. (See, e.g., Dkt. No. 1, Compl. ¶ 24 (alleging that "as a result of the Defendants' wrongful actions the Defendants violated the collective bargaining agreement by terminating the Plaintiff's employment without just cause").)

Because Plaintiff essentially concedes that he did not follow the procedures set forth in the CBA and does not contest that a challenge to his termination falls within the purview of the CBA, Defendants' motion for summary judgment will be allowed on Counts 1, 2, 3, and 7.

C.    Intentional Tort Claims.

Pursuant to the Massachusetts Tort Claims Act, public employees sued in their official capacity are not liable for intentional torts. Mass. Gen. Laws ch. 258, § 10(c). See Kelley v. Laforce, 288 F.3d 1, 12 (1st Cir. 2002). Thus, the only Defendants against whom Plaintiff may allege intentional torts are Defendants Weisgerber and McDowell, both of whom are sued in their professional and personal capacities.

1. <u>Count 4: Misrepresentation</u>.

"Under Massachusetts law, a claim for misrepresentation entails a false statement of material fact made to induce the plaintiff to act and reasonably relied upon by him to his detriment." <u>Rodi v. S. New Eng. Sch. of Law</u>, 389 F.3d 5, 13 (1st Cir. 2004). Here, not only are Plaintiff's complaint and statement of facts devoid of "'the who, what, where, and when of the allegedly false or fraudulent representation,'" but Plaintiff does not specifically refer to a single statement made by any Defendant that could form the basis of this claim. <u>Id.</u> at 15 (quoting <u>Alternative Sys. Concepts, Inc. v. Synopsys, Inc.</u>, 374 F.3d 23, 29 (1st Cir. 2004)). Thus, Defendant's motion for summary judgment on Count 4 will be allowed.

2. <u>Count 5: Civil Conspiracy</u>.

Count 5 alleges that Defendants acted in concert to work "toward their mutual goal of terminating the Plaintiff's employment." (Dkt. No. 1, Compl. ¶ 46.) Massachusetts recognizes two types of civil conspiracy: true conspiracy and conspiracy based on vicarious liability. <u>See</u> <u>Taylor v. Am. Chem. Council</u>, 576 F.3d 16, 34-35 (1st Cir. 2009). Because Plaintiff has advanced no argument under either theory and has pointed to no facts or law to support the claim, Defendants' motion for summary judgment on Count

5 will be allowed.

    3.   <u>Count 6: Defamation</u>.

    An action for defamation requires a plaintiff to show that

> the defendant was at fault for the publication of
> a false statement of and concerning the plaintiff
> which was capable of damaging his or her
> reputation in the community and which either
> caused economic loss or is actionable without
> proof of economic loss.

<u>Stanton v. Metro Corp.</u>, 438 F.3d 119, 124 (1st Cir. 2006).
Plaintiff specifically alleges that Defendant Weisgerber
published defamatory statements to the Massachusetts
Department of Education ("DOE") and to the parents of
students in the HVAC program.  As to statements to parents,
he has pointed to no support in the record for his
allegation that Defendant Weisgerber "began to falsely
inform the parents of the HVAC students that Mr. Estock was
not stable."  (Dkt. No. 1, Compl. ¶ 28.)

    With respect to statements to the DOE, Plaintiff
alleges that the following statement, which appears in
Defendant Weisgerber's September 2007 letter to DOE Director
Wheeler, is defamatory:

> As the Director of Westfield Vocational
> Technical High School, I believe that now is the
> time to make this change. I feel this is the only
> alternative we have at this time.  The instructors
> [sic] unwillingness to cooperate with
> Administration, develop appropriate lesson plans
> and ways to meet the demands of the COP

18

(Certificate of Occupational Proficiency) make
this a necessary recommendation.

(Dkt. No. 21, Ex. 21.)  Plaintiff contends that Defendant
Weisgerber published this comment with "actual malice,"
which obviates any determination as to its veracity.  <u>See</u>
<u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 28 (1st Cir. 2009)
(holding that in Massachusetts, "even a true statement can
form the basis of a libel action if the plaintiff proves
that the defendant acted with 'actual malice'").  As
evidence of actual malice, and with no further explication,
Plaintiff points to Defendant Weisgerber's 2006 letter to
Defendant McDowell.  Although this letter evidences
Defendant Weisgerber's serious misgivings about Plaintiff's
ability to perform his job, it does not even remotely
suggest "actual malice," which requires a showing of
"malevolent intent or ill will."  <u>Id.</u>

     For their part, Defendants argue that, even if this
statement is defamatory, a point that they do not concede,
Defendant Weisgerber is protected by the "conditional
privilege" granted where "publication is reasonably
necessary to the protection or furtherance of a legitimate
business interest."  <u>Bratt v. Int'l Business Machines Corp.</u>,
467 N.E.2d 126, 131 (Mass. 1984).

     Here, the court will turn directly to the statement
itself for resolution of the merits of this claim.  Upon

examination, it is apparent that Defendant Weisgerber's statement is one of opinion, not of fact and thus cannot in any event constitute defamation.  See King v. Globe Newspaper Co., 512 N.E.2d 241, 243 (Mass. 1987) ("Statements of fact may expose their authors or publishers to liability for defamation, but statements of pure opinion cannot. Statements of pure opinion are constitutionally protected.").  In making this determination, the court, as is required, has considered "the statement in its totality in the context in which it was uttered or published."  Cole v. Westinghouse Broadcasting Co., 435 N.E.2d 1021, 1025 (Mass. 1982) (citation omitted).  The court also "gave weight to cautionary terms used by the person publishing the statement."  Id.  Finally, as it must, the court "consider[ed] all of the circumstances surrounding the statement, including the medium by which the statement [was] disseminated and the audience to which it [was] published." Id.

Here, Defendant Weisgerber's statement began with qualifiers that indicate that this was her opinion: "As the Director of Westfield Vocational Technical High School, I believe . . ." and "I feel this is the only alternative we have at this time."  (Dkt. No. 21, Ex. 21 (emphases added).) Her charges of wrongdoing against Plaintiff were similarly

based on her impression of his ability to perform his job,
specifically, her judgment that Plaintiff is "unwilling[] to
cooperate," and her judgment that Plaintiff has failed to
create what she would consider to be "appropriate lesson
plans." (Id. (emphases added).) These statements, which
reflect Defendant Weisgerber's views about Plaintiff, are
not fact-based statements that could be either true or
false, and thus, as a matter of law, they cannot be
defamatory. Noonan, 556 F.3d at 26 (observing that "a given
statement, even if libelous, must also be false to give rise
to a cause of action").

Accordingly, Defendants' motion for summary judgment on
Count 6 will be allowed.

### 4. Count 12: Illegal Interference with Employment Relationship.

Plaintiff alleges that Defendants violated a rarely
invoked statute, Mass. Gen. Laws ch. 149, § 19, which
provides that "[n]o person shall, by intimidation or force,
prevent or seek to prevent a person from entering into or
continuing in the employment of any person." Id. Plaintiff
has not identified any evidence to support a charge of
intimidation or force, and, for that reason, the court will
allow Defendants' motion for summary judgment on Count 12.

### 5. Count 13: Invasion of Privacy.

Plaintiff alleges that Defendants published his

"private matters" to WVTHS employees, students, and parents in violation of Mass. Gen. Laws ch. 260, § 2(A). (Dkt. No. 1, Compl. ¶ 70.) The first problem with this claim is that it identifies the incorrect statute, namely Massachusetts' statute of limitations. Assuming that Plaintiff intended to allege that Defendants violated his right of privacy under Mass. Gen. Laws ch. 214, § 1B, Plaintiff has not identified, and the court could not discern, any facts of record that would support this claim. See Dasey v. Anderson, 304 F.3d 148, 154 (1st Cir. 2002) (noting that Massachusetts' invasion of privacy statute "is typically invoked to remedy 'the gathering and dissemination of information which the plaintiff[] contended was private"). Accordingly, Defendants' motion for summary judgment on Count 13 will be allowed.

For the reasons set forth above, Defendants are entitled to summary judgment on Counts 4, 5, 6, 12, and 13.

D. Counts 16 and 17: Disability Discrimination Claims.

Plaintiff alleges that he suffers from depression, stress, and anxiety and was both discriminated against because of these disabilities and denied reasonable accommodations in violation of 42 U.S.C. § 12111 and Mass. Gen. Laws ch. 151B, § 4(16). Plaintiff's claims fail for the simple reason that he has presented no evidence that he

was disabled.  See Ruiz Rivera v. Pfizer Pharms., LLC, 521
F.3d 76, 82 (1st Cir. 2008) (holding that to establish a
prima facie case of disability discrimination under the ADA,
a plaintiff must prove: "(1) that [he] was 'disabled' within
the meaning of the ADA; (2) that [he] was able to perform
the essential functions of [his] job with or without
accommodation; and (3) that [he] was discharged or adversely
affected, in whole or in part, because of [his]
disability"); Dartt v. Browning-Ferris Indus., 691 N.E.2d
526, 528 (Mass. 1998) ("[T]o establish a prima facie case of
unlawful employment discrimination on the basis of handicap
under [Mass. Gen. Laws ch. 151B, § 4(16)], a plaintiff must
present credible evidence that (1) he is handicapped within
the meaning of the statute; (2) he is qualified to perform
the essential functions of the job with or without
reasonable accommodation; (3) he was terminated or otherwise
subject to an adverse action by his employer; and (4) the
position he had occupied remained open and the employer
sought to fill it.").

The medical evidence in the record is limited to two
notes from Dr. Gurpal Kingra.  On March 27, 2007, Dr. Kingra
provided Plaintiff with a note stating, "Mr. Estock can
return to work.  He is advised to avoid stress."  (Dkt. No.
21, Ex. 9.)  On April 3, 2007, Dr. Kingra completed a

23

disability certificate indicating that Plaintiff was "totally incapacitated" on February 6, 2007, after which he was "sufficiently recovered to return to work" with no limitations.  (Dkt. No. 27, Ex. 12.)  It is beyond dispute that these two brief medical notations, neither of which contains a diagnosis and both of which recommend a return to work, are insufficient to demonstrate that Plaintiff had "a physical or mental impairment that substantially limited one or more of [his] major life activities," as is required for a claim of violation under both federal and state law. Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 (1st Cir. 2010); see also City of New Bedford v. Mass. Comm'n Against Discrimination, 799 N.E.2d 578, 588 (Mass. 2003). Defendants' motion for summary judgment on Counts 16 and 17 will accordingly be allowed.[4]

E.  **Counts 8 and 9: Civil Rights Violations**.

Plaintiff's claims of violation of 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H and 11I, arise out of Defendants' alleged violation of his First Amendment right to free speech. "Section 1983 supplies a private right of action against a

---

[4] Although unnecessary, the court observes that Plaintiff provided no evidence of any causal link between his suspension and any alleged disability or of any requests for accommodations beyond Dr. Kingra's recommendation that he avoid stress.

person who, under color of state law, deprives another of rights secured by the Constitution or by federal law." Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996). The MCRA provides a similar private right of action for state law and constitutional violations but requires an additional showing that the interference or attempted inference with civil rights was "by threats, intimidation or coercion." Mass. Gen. Laws ch. 12, §§ 11H and 11I; see Bally v. Northeastern Univ., 532 N.E.2d 49, 51-52 (Mass. 1989).

Plaintiff's specific allegation, arising out of his placement on administrative leave following the open house, is that:

> [t]he Defendants violated the Plaintiff's free speech rights and his rights his rights [sic] of free association with the students in his program and the parents of the students in his program. The Defendants retaliated against the plaintiff by constructively terminating his employment because he exercised his free speech rights and his rights of free association.

(Dkt. No. 1, Compl. ¶ 58.)

As the First Circuit has recently reasserted, "the law is 'settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.'" Diaz-Bigio v. Santini, No. 09-2575, 2011 U.S. App. LEXIS 13257, *16 (1st Cir. June 29, 2011) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)). Of course, it is equally well settled

that "this prohibition is not absolute. 'In recognition of
the government's interest in running an effective workplace,
the protection that public employees enjoy against speech-
based reprisals is qualified.'" Id. (quoting Decotiis v.
Whittemore, 635 F.3d 22, 29 (1st Cir. 2011)).

To prove that Defendants unlawfully retaliated against
him based on his speech, Plaintiff

> must establish that (1) his expression involved
> matters of public concern; (2) his interest in
> commenting upon those matters outweighed
> [Defendants'] interests in the efficient
> performance of [their] public services; and (3)
> his protected speech was a substantial or
> motivating factor in [Defendants'] adverse
> employment actions.

Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir. 2003).
Plaintiff easily satisfies this third prong as it is
undisputed that his "improper conduct in [his] position as
teacher in the Westfield Public Schools related to the Open
House" formed the basis of the administrative leave. (Dkt.
No. 27, Ex. 18.) Moreover, while on leave, Plaintiff was
prohibited from contacting students, parents, and staff
about the investigation into his conduct at the Open House.

As to the first prong "a court must determine 'whether
the employee spoke as a citizen on a matter of public
concern.'" Decotiis, 635 F.3d at 29 (quoting Curran v.
Cousins, 509 F.3d 36, 45 (1st Cir. 2007)). Assuming
arguendo that Plaintiff's comments about the HVAC program at

the open house "related to matters of public concern"
because they included "his views on the public school
curriculum," Hennessy v. City of Melrose, 194 F.3d 237, 246
(1st Cir. 1998), Plaintiff's status at the moment of his
expression is less clear.  As the First Circuit has pointed
out, "the more intertwined the speech is with the employee's
work station the less likely it is that the speech is
protected as citizen speech."  Decotiis, 635 F.3d at 33
n.12.  "[A] court must ask, 'what are the employee's
official responsibilities?' and . . . 'was the speech at
issue made pursuant to those responsibilities?'"  Id. at 31
(citations omitted).  The second inquiry requires "a hard
look at the context of the speech."  Id. at 32.  Here,
although Plaintiff's tone at the open house is contested,
all accounts of his speech are that he was answering
parents' questions about the future of the HVAC program and
his ability to teach it.  Rather than speaking as a citizen,
he was speaking at a school-sponsored open house as the sole
teacher in the HVAC program, which gave his speech the mark
of "official significance" because he was performing "'the
duties an employee actually is expected to perform,'" namely
discussing a school program with parents at an open house.
Id. at 34 & 31 (quoting Mercado-Berrios v. Cancel-Alegria,
611 F.3d 18 (1st Cir. 2010)).  Thus, Plaintiff cannot

satisfy the first prong of the analysis because he was not
expressing himself as a citizen offering his opinions on
matters of public concern.  Rather, he was speaking as a
public employee on school grounds at a school event about
matters at the heart of his employment.  Analysis of the
second prong, while unnecessary given the court's ruling on
the first, demonstrates this point even more clearly.

     Resolution of prong two requires the court to apply a
balancing test first articulated in Pickering v. Board of
Education, 391 U.S. 563 (1968), in which, as the First
Circuit explained:

     the value of an employee's speech -- both the
     employee's own interests and the public's interest
     in the information the employee seeks to impart --
     [is balanced] against the employer's legitimate
     government interest in preventing unnecessary
     disruptions and inefficiencies in carrying out its
     public service mission.

Guilloty Perez v. Pierluisi, 339 F.3d 43, 52 (1st Cir. 2003)

(citations omitted).  See also Pickering, 391 U.S. at 568

(describing prong two as requiring the court to strike "a

balance between the interests of the teacher, as a citizen,

in commenting upon matters of public concern and the

interest of the State, as an employer, in promoting the

efficiency of the public services it performs through its

employees").  In its analysis, the court should not consider

the speech "in a vacuum; the manner, time, and place of the

28

employee's expression are relevant, as is the context in which the dispute arose.'" Hennessy, 194 F.3d at 247 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)). Underlying the analysis are the well-accepted tenets that "[t]he successful operation of a [public] school requires the person in charge to be in charge and to maintain close working relationships with each of her teachers" and that a school has a "strong interest in preserving a collegial atmosphere, harmonious relations among teachers, and respect for the curriculum." Id. at 248-49.

Applying these factors to the undisputed facts of this case -- Plaintiff's classroom as the location of the speech, the relationship between Plaintiff and Defendant Weisgerber as teacher and principal, and the angry reaction of parents -- Plaintiff's interest in public expression here cannot be said to outweigh Defendants' "interests in the efficient performance of its public services." Lewis, 321 F.3d at 218.

Furthermore, to the extent that Plaintiff's allegation includes restrictions on future speech, the restrictions were minimal. Although Plaintiff alleges that he was told that "he was to have no contact with any students . . . [and] to keep his mouth shut regarding the Westfield School Department phase out of the HVAC program," (Dkt. No. 1,

Compl. ¶ 25), in fact, Defendant Weisgerber's letter contained a very specific restriction: a temporary prohibition (duration of the investigation) from contact with specific people (students, parents, and school staff) about a specific topic (the investigation).  (See Dkt. No. 27, Ex. 18 ("You are to have no contact with students and parents of the HVAC program or any other school staff related to this investigation during the leave of absence.").)

Because Plaintiff is unable to satisfy the requirements of a § 1983 or MCRA free speech claim, the court will allow Defendants' motion for summary judgment on Counts 8 and 9.

F.  **Miscellaneous Claims**.

   1.  **Count 14: Involuntary Retirement of Public Employee**.

Massachusetts General Laws chapter 32, section 16, which outlines early retirement procedures based on disability, provides that an employee may appeal an involuntary retirement decision made by the Contributory Retirement Appeal Board ("Board") to the Massachusetts district court.  Mass. Gen. Laws 32, § 16.  The statute provides no cause of action for Plaintiff, who, at least as reflected by the record, never appealed any decision to the Board.  Therefore, Defendants' motion for summary judgment on Count 14 will be allowed.

2.  <u>Count 15: Public School Employee Tenure</u>.

Massachusetts General Laws chapter 71, section 41 defines the tenure status of public school teachers and administrators and provides that a teacher seeking review of dismissal may file a petition with the commissioner for arbitration.  Mass. Gen. Laws ch. 71, § 41.  The only evidence in the record concerning arbitration is Plaintiff's request to hold his petition for arbitration in abeyance while he considered Defendants' settlement offer.  (Dkt. No. 21, Ex. 43.)  The statute provides that "the arbitral decision shall be subject to judicial review."  Mass. Gen. Laws ch. 71, § 41.  Because there was no such decision, Defendants' motion for summary judgment on Count 15 will be allowed.

3.  <u>Count 18: Whistle Blower Protection</u>.

The Massachusetts Whistle Blower statute prohibits public employers from retaliating against employees for disclosing or threatening to disclose an unlawful policy or practice by the employer.  Mass. Gen. Laws ch. 149, § 185. To demonstrate violation of the statute, "a plaintiff must show that he engaged in protected activity and that his participation in that activity played a substantial or motivating part in the retaliatory action."  <u>Welch v. Ciampa</u>, 542 F.3d 927, 943 (1st Cir. 2008).

As a threshold matter, Plaintiff's claim fails because "[t]he Whistleblower statute permits only an 'employer' to be sued, not individual supervisors."  Id. at 943 n.6 (quotation marks omitted).  Employers include "the commonwealth, and its agencies or political subdivisions, including but not limited to, cities, towns, counties and regional school districts, or any authority commission, board or instrumentality thereof."  Mass. Gen. Laws ch. 149, § 185 (2).  The only defendants who could be liable under the statute are the City of Westfield and the School Board, yet Plaintiff alleged no facts pertaining to any conduct, wrongful or otherwise, on the part of the City or any Board members.  For this reason alone, summary judgment on Count 18 would be proper.

Substantively, Plaintiff's claim is no more viable. First, Plaintiff alleges that his employment was terminated "to prevent the Plaintiff from disclosing to a public body an activity, policy or practice" that he believed was in violation of a law.  (Dkt. No. 1, Compl. ¶ 87 (emphasis added).)  The statute prohibits retaliatory conduct on the part of an employer, not preventative conduct.  Assuming arguendo that Plaintiff intended to allege that Defendants retaliated against him for past conduct, it is significant that Defendant Weisgerber first recommended elimination of

the HVAC program in 2006, prior to any of Plaintiff's documented complaints –- specifically to the School Committee about safety issues in January 2007 (Dkt. No. 27, Ex.10), to parents at the open house in September 2007, and to the Environmental Protection Agency in April 2008. (Dkt. No. 27, Ex. 5.)

Moreover, throughout this time, although Defendant Weisgerber continued to seek elimination of the program, Defendants engaged in settlement discussions with Plaintiff, all of which included offers to Plaintiff to return to his position and all of which Plaintiff declined. Further, when Plaintiff's position was officially eliminated by Superintendent Alvira, it is noteworthy that he was immediately informed that his seniority provided him with a means to "bump" other teachers. (Dkt. No. 27, Ex. 30.) Plaintiff's allegation that Defendants refused to "bump" junior teachers lacks support in the record, with the only evidence demonstrating that Plaintiff sought only to "bump" teachers from positions for which he was not licensed. (Dkt. No. 27, Ex. 31.) Even if true, Plaintiff's charge that Defendants failed to send him a list of open positions has no obvious, or even inferential, connection to any retaliatory motivation on Defendants' part.

For these reasons, Defendants' motion for summary

judgment on Count 18 will be allowed.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 20) is hereby ALLOWED as to all counts. The clerk will enter judgment for Defendants. This case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge